**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| HERRON FOR CONGRESS, | : | |
| | : | |
| Plaintiff, | : | Civil Action No.:   11-1466 (RC) |
| | : | |
| v. | : | Re Document Nos.:   15, 17 |
| | : | |
| FEDERAL ELECTION COMMISSION | : | |
| | : | |
| Defendant. | : | |

## MEMORANDUM OPINION

### DENYING THE PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT; GRANTING THE FEDERAL ELECTION COMMISSION'S CROSS-MOTION FOR SUMMARY JUDGMENT

### I.  INTRODUCTION

Two years ago, Roy Herron ran an unsuccessful campaign for Congress. Herron now alleges that his opponent violated federal law by failing to make certain disclosures in his filings with the Federal Election Commission ("FEC"). Herron[1] filed an administrative complaint with the FEC, which investigated the matter but decided not to issue any penalties. Herron then filed suit in this court, alleging that the FEC acted arbitrarily, capriciously, and contrary to law. Because the court lacks jurisdiction to hear Herron's claim, the court will deny Herron's motion for summary judgment and grant the FEC's cross-motion for summary judgment.

---

[1] The named plaintiff in this action is "Herron For Congress," the political committee that was authorized to receive campaign contributions and make expenditures on behalf of Roy Herron's campaign. *See* 2 U.S.C. § 431 (5)–(6). For convenience, the court will refer to the plaintiff as "Herron."

## II.  BACKGROUND

### A.  Legal Framework

#### 1.  The Federal Election Campaign Act's Financial Disclosure Requirements

The Federal Election Campaign Act ("FECA") requires congressional candidates' campaign committees to file regular financial disclosure reports in election years.  2 U.S.C. § 434(a)(2).  These reports must include the identity of each "person who makes a loan to the reporting committee during the reporting period, together with the identification of any endorser or guarantor of such loan, and date and amount or value of such loan."  *Id.* § 434(b)(3)(E).  Thus, if a candidate obtains a bank loan in connection with the candidate's campaign, the candidate's campaign committee must disclose that fact in its financial disclosure forms.  *See* 11 C.F.R. § 104.3(d)(4).  The committee must also report the date, amount, and interest rate of the loan, as well as the types and value of collateral or other sources of repayment used to secure the loan.  *Id.* § 104.3(d)(1).

#### 2.  The Federal Election Campaign Act's Ban on Corporate Contributions

The FECA also prohibits corporations and national banks from making financial contributions in connection with any federal campaign.  2 U.S.C. § 441b(a).  However, a political committee can obtain a bank loan without violating this rule, provided that the loan complies with applicable banking laws and that the loan was issued in the regular course of business.  11 C.F.R. § 100.82(a).[2]

---

[2]   A loan will be deemed in the ordinary course of business if it (1) bears the usual and customary interest rate of the lending institution for the category of loan involved; (2) is made on a basis that assures repayment; (3) is evidenced by a written instrument; and (4) is subject to a due date or amortization schedule.  11 C.F.R. § 100.82(a).

### 3. Administrative Complaints and Judicial Review

Any person who believes a violation of the FECA has occurred may file an administrative complaint with the FEC. 2 U.S.C. § 437g(a)(1). After receiving the complaint, the FEC may investigate the matter and determine the appropriate course of action. *See generally id.* § 437g(a)(2)–(6). If the FEC determines that no violation occurred, it may dismiss the complaint. *See id.* § 437(g)(a)(8)(A); *Hagelin v. FEC*, 411 F.3d 237, 239 (D.C. Cir. 2005). A party whose complaint has been dismissed may then file a civil action in this court to challenge the FEC's decision. 2 U.S.C. § 437g(a)(8)(A). But "[h]aving the right to file an administrative complaint with the FEC does not necessarily give Plaintiffs standing to seek judicial review . . . in this Court." *Citizens for Responsibility & Ethics in Washington v. FEC*, 799 F. Supp. 2d 78, 85 (D.D.C. 2011). As a threshold matter, therefore, Herron must establish that this court has jurisdiction to hear his claim. *See id.*

### B. Factual Allegations and Procedural Background

In 2010, Roy Herron was the Democratic Party's candidate in the race to represent Tennessee's 8th congressional district in the U.S. House of Representatives. His Republican opponent was Steven Fincher. On July 23, 2010, Fincher's campaign committee filed a financial disclosure report indicating that it had received $250,000 from Fincher's personal funds. Pl.'s Mot. at 8.

In September 2010, Herron filed an administrative complaint with the FEC. AR 1–18. The complaint alleged that Fincher's campaign misreported the source of the funds. Herron alleged that the funds were actually provided by Gates Bank & Trust Company ("Gates Bank"), a Tennessee bank. Herron also alleged that the Gates Bank loan violated various banking regulations. Herron thus alleged two potential FECA violations: (1) the Fincher campaign's

failure to file accurate financial disclosures, and (2) the Fincher campaign's receipt of an unlawful corporate contribution (in the form of an irregular bank loan).

On October 6, 2010, the FEC mailed a copy of Herron's administrative complaint to the Fincher campaign; the Fincher campaign did not file its response until December 2, 2010—nearly a month after Fincher won the election. AR 58–81. Fincher also filed an amendment to his earlier financial disclosures. AR 83–110. Fincher acknowledged that his campaign committee failed to accurately report the source of the Gates Bank loan. AR 60. Fincher also explained that the Gates Bank loan was "erroneously" and "unintentionally" reported to have a zero percent interest rate, when the loan actually carried a 6.5% interest rate. AR 60. Fincher's campaign updated its disclosures and pointed out that the loan had been repaid in full by November 17, 2010. AR 61, 83–110.

After reviewing the parties' claims and the available evidence, the FEC's Office of the General Counsel issued a report summarizing its view of the case. *See* AR 687–712. The report first recommended that the Commission find that Fincher violated the FECA and FEC regulations by misreporting the source of the loan. AR 687–88. However, the report did not find reason to believe that Fincher's reporting violations were knowing or willful. AR 692. Although it noted that "the public would have been better served by more timely amendments," the report concluded that there was no evidence to suggest that Fincher's amended disclosures were intentionally delayed. *Id.* Finally, the report concluded that the Gates Bank loan was not an illegal corporate contribution because the loan complied with applicable banking laws and regulations. AR 693 (citing 11 C.F.R. § 100.82(a)). The Commissioners then voted to dismiss the complaint.[3]

---

[3] It appears that all six commissioners had reason to believe that Fincher had violated the FECA, but they never held a formal vote on this question. Instead, they held a number of votes on the

Herron alleges that the FEC's decision has clouded his political future. Herron has made clear that he will not run for office in 2012. *See* Pl.'s Reply, Ex. 2 ("Herron Decl.") ¶ 5. In addition, Herron has not yet decided whether he will be a candidate in any future elections. Herron nevertheless maintains that he will decide "probably in the summer or fall" of next year whether to run for Congress in 2014. *Id.* ¶ 30. He maintains that his decision will turn, at least in part, upon the result of this lawsuit. *Id.* ¶¶ 15, 19. Apparently, if Herron succeeds and the FEC decides to punish Fincher for his earlier transgressions, Herron is more likely to decide to run for office in the future. *Id.* ¶¶ 19–20.

### III. ANALYSIS

### A. Herron's Claim is Moot

Herron alleges that he was wronged in an election that came to a close nearly two years ago. Of course, this court has no power to alter the past. *See Virginians Against a Corrupt Congress v. Moran*, 1993 WL 260710, at *1 (D.C. Cir. June 29, 1993) (per curiam) ("The passage into history of the 1992 election makes it impossible for this or any court to grant meaningful relief with respect to that election."). Given the irreversibility of the 2010 election, it falls on Herron to demonstrate that his claim is not moot. *See Davis v. FEC*, 554 U.S. 724, 736 (2008) (resolving electoral dispute under doctrine of mootness); *FEC v. Wis. Right to Life, Inc.* ("*WRTL*"), 551 U.S. 449, 462 (2007) (same), *Shays v. FEC*, 424 F. Supp. 2d 100, 110 (D.D.C. 2006) (same); *Natural Law Party v. FEC*, 111 F. Supp. 2d 33, 40–41 (D.D.C. 2000) (same).

Herron may do so by showing that the controversy is "capable of repetition, yet evading review." *See WRTL*, 551 U.S. at 462; *Branch v. FCC*, 824 F.2d 37, 41 n.2 (D.C. Cir. 1987) ("Controversies that arise in election campaigns are unquestionably among those saved from

---

appropriate penalty; after those votes deadlocked, the commissioners voted to dismiss Herron's complaint. Def.'s Mot. at 9–11.

mootness under the exception for matters 'capable of repetition, yet evading review.'"). Under this doctrine, Herron must show that "(1) the challenged action is in its duration too short to be fully litigated prior to cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subject to the same action again." *WRTL*, 551 U.S. at 462. The court will assume that Herron's claim—like most electoral controversies—could not be fully litigated prior to election day. *See Johnson v. FCC*, 829 F.2d 157, 159 n.7 (D.C. Cir. 1987). Nevertheless, it seems doubtful that Herron can satisfy the second prong of the "capable of repetition, yet evading review" inquiry.

Herron must demonstrate a "reasonable expectation" or a "demonstrated probability" that "the same controversy will recur involving the same complaining party." *Murphy v. Hunt*, 455 U.S. 478, 482 (1982) (per curiam). Ordinarily, courts require plaintiffs to submit evidence suggesting that their controversy is likely to recur. *See Davis*, 554 U.S. at 736 (concluding that the plaintiff's challenge to campaign finance regulations was not moot because the plaintiff had publicly announced his intent to run for Congress in the next election); *WRTL*, 551 U.S. at 463 (finding a "demonstrated probability" that the controversy was capable of repetition in the next election cycle because the plaintiff had filed a similar legal challenge to the same campaign finance regulations in the previous election cycle). Here, Herron admits that he is only *considering* a run for office in the future. Herron Decl. ¶ 30. He maintains that his decision to run is somewhat conditional on this court's ruling: namely, if he secures a favorable decision in this court, he is more likely to seek office at a later date. *Id.* ¶¶ 19–20.

This Circuit considered a factually similar matter in *Unity08 v. FEC*, 596 F.3d 861, 865 (D.C. Cir. 2010). There, a political organization sought review of an advisory opinion issued by the FEC. *Id.* By the time the case reached the Circuit, the 2008 election was over, and the FEC

6

argued that the plaintiff's claim was moot. *Id.* at 864. The organization asserted that it intended to engage in fundraising operations in 2012—but only if its lawsuit was successful and the FEC's advisory opinion was vacated. *Id.* The court concluded that the controversy was capable of repetition because the plaintiff had "unambiguously" expressed a conditional intent to participate in future elections. *Id.*

Unlike the plaintiff in *Unity08*, Herron has not demonstrated any "clear and definite intent" to participate in future electoral contests if he prevails in this lawsuit. *See* Herron Decl. ¶ 30 ("Next year—probably in the summer or fall—*I will make a decision* whether to run for federal office in the 2014 election.") (emphasis added). Thus, the court is not fully convinced that Herron's vague intentions create a justiciable controversy.

But Herron's intent to seek future office is only one half of the equation. Even if Herron were to run for office again, he must still show a demonstrable probability that he will be "subjected to the *same action* again." *Pharmachemie B.V. v. Barr Labs.*, 276 F.3d 627, 633 (D.C. Cir. 2002). This requirement is easily met when a candidate challenges an electoral regulation that "remain[s] on the books," *Dunn v. Blumstein*, 405 U.S. 330, 333 (1972), thereby "remain[ing] and control[ling] future elections," *Moore v. Ogilvie*, 394 U.S. 814, 816 (1969); *see Davis*, 554 U.S. at 736 (concluding that regulations enacted by the Bipartisan Campaign Reform Act were likely to recur); *WRTL*, 551 U.S. at 462 (same). It is also possible for a plaintiff to challenge events that are certain to accompany every election cycle, even if they are not written into law. *Johnson v. FCC*, 829 F.2d at 159 n.7 (concluding that there was evidence that a controversy involving presidential debates "will persist in future elections" because of debates' recurrence); *Natural Law Party*, 111 F. Supp. 2d at 45 (concluding that there was "more than a speculative possibility" that presidential debates would occur again).

Here, Herron complains of a one-time event: Gates Bank's loan to Fincher's campaign committee. To prove that this act will recur, Herron must establish that (1) Fincher will run for Congress again, (2) Fincher will again receive a bank loan, (3) Fincher will again fail to disclose the loan in a timely fashion, and (4) the loan will violate applicable FEC regulations. In general, courts must be wary of claims that are "highly dependent upon a series of facts unlikely to be duplicated in the future." *See People for Ethical Treatment of Animals, Inc. v. Gittens*, 396 F.3d 416, 424 (D.C. Cir. 2005) ("To conclude that a dispute like this would arise in the future requires us to imagine a sequence of coincidences too long to credit."); *Bois v. Marsh*, 801 F.2d 462, 467 (D.C. Cir. 1986) (concluding that the plaintiff's claim was not capable of repetition because "there are too many variables to allow a prediction that appellant will again be subjected to an action of this sort"). Moreover, Herron has not submitted any evidence to suggest that these events will occur. And when a claim rests entirely on an unlikely chain of hypothetical occurrences, the court must conclude that the controversy is not likely to reappear. *James v. U.S. Dept. of Health & Human Servs.*, 824 F.2d 1132, 1136 (D.C. Cir. 1987); *Alliance for Democracy v. FEC*, 335 F. Supp. 2d 39, 39 (D.D.C. 2004) ("[T]his Court finds that plaintiffs' argument that these same plaintiffs will at some point in the future have a basis to believe that the Act has been violated, again file an administrative complaint, and again claim the FEC [acted unlawfully] is far too attenuated . . . [and does] not support the finding of an Article III injury.").

Herron nevertheless argues that he faces a "real possibility" that a similar controversy will occur if he runs in 2014. Herron Decl. ¶ 16. Herron maintains that this possibility stems from the FEC's decision to turn a blind eye to Fincher's misconduct. By "demonstrating that it will not deter such conduct," Herron alleges, the FEC has ensured that similar violations will proliferate. Because Herron does not provide any evidence on this score, his claim is theoretical

at best. And a "theoretical possibility" does not create a justiciable controversy. *Murphy v. Hunt*, 455 U.S. at 482; *Pharmachemie*, 276 F.3d at 633; *see also Hall v. Beals*, 396 U.S. 45, 49–50 (1969) (rejecting "speculative contingencies" regarding future elections as grounds for continuing a moot controversy); *Golden v. Zwickler*, 394 U.S. 103, 109 (1969) (concluding that it was "wholly conjectural" that the plaintiff would be a candidate for Congress again and thereby run afoul of a state's electoral regulation). Because Herron has submitted no evidence to suggest that the facts surrounding Fincher's bank loan are likely to recur, the court concludes that his case is moot.

### B. Herron Lacks Standing

In the alternative, the court concludes that Herron lacks standing. To meet the constitutional requirement of standing, a plaintiff must show that: (1) he has suffered an injury which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) there is a causal connection between the alleged injury and conduct that is fairly traceable to the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). Although the concept of standing "cannot be reduced to a one-sentence or one-paragraph definition," *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 471 (1982), it is clear that plaintiffs asserting Article III standing must present a dispute of "sufficient immediacy and reality," *Davis v. Liberty Mut. Ins. Co.*, 871 F.2d 1134, 1137 n.3 (D.C. Cir. 1989), that is not based on a "hypothetical state of facts," *Aetna Life Ins. Co. of Hartford, Conn. v. Haworth*, 300 U.S. 227, 241 (1937); *see also Diaz v. Duckworth*, 143 F.3d 345, 347 (7th Cir. 1998) (Posner, J.) ("A basic principle of standing is that a person is not entitled to litigate in a federal court unless he can show a reasonable probability of obtaining a tangible benefit from winning. Certainty is not required but a remote possibility won't do.").

In the electoral context, a candidate may establish Article III standing by establishing that he or she will be forced to compete in an "illegally structured" campaign environment. *LaRoque v. Holder*, 650 F.3d 777, 787 (D.C. Cir. 2011). In contrast, an individual cannot demonstrate standing simply by alleging that he was "deprived of the knowledge as to whether a violation of the law has occurred." *Common Cause v. FEC*, 108 F.3d 413, 417 (D.C. Cir. 1997) (per curiam). "To hold otherwise would be to recognize a justiciable interest in having the Executive Branch act in a lawful manner." *Id.* Thus, a plaintiff must show some concrete injury aside from an allegation that the "FEC failed to process its complaint in accordance with law." *Id.*

Jurisdiction may be lacking if it is too early to determine whether the plaintiff will actually be subjected to an illegally structured campaign environment. For example, in *McConnell v. FEC*, 540 U.S. 93 (2003), Senator McConnell brought a constitutional challenge to the Bipartisan Campaign Reform Act ("BCRA"). Because the BCRA was not scheduled to affect Senator McConnell's reelection campaign for several years, the Court concluded that his alleged injury was "too remote temporally to satisfy Article III standing." *Id.* at 226 (concluding that plaintiffs must allege "certainly impending" injuries to establish a cognizable injury-in-fact). Similarly, *LaRoque v. Holder* involved a constitutional challenge to the Voting Rights Act of 1965 that was brought by a plaintiff who claimed that he intended to run for office in the near future. Before turning to the merits of the plaintiff's claim, the Circuit took care to verify whether the evidence established a "substantial probability" that the plaintiff would actually be a candidate in the upcoming election. 650 F.3d at 788. The Circuit concluded that the plaintiff had proved as much by expressing his definite intent to run and by publicly announcing his intent to the press. *Id.*

Unlike the plaintiff in *LaRoque*, Herron has not represented to the court that he harbors any definite intent to run. In addition, Herron has not made any public pronouncements which might bind him to such a promise. And it is not yet known whether Herron wishes to run in the 2014 election, or whether he will wait until a later date. In view of these facts, the court concludes that Herron has not established any "substantial probability"—that is to say, anything above a theoretical chance—that he will once again run for public office. Absent a demonstrable probability that he will be subjected to an illegally structured campaign environment in the future, Herron's claim is based on nothing more than the generalized interest in having the FEC act in a lawful manner. This interest does not give rise to standing. *Common Cause*, 108 F.3d at 417.

Herron raises several additional arguments, but they do not persuade the court to alter its conclusion. First, Herron tries to avail himself of the Circuit's decision in *Shays v. FEC*, which held that members of Congress who were running for re-election had standing to challenge several FEC regulations. 44 F.3d at 90. There, the plaintiffs established a cognizable injury by demonstrating that the new regulations would force them to revise their re-election strategy. *See id.* at 87 ("Because Shays and Meehan have asserted [that they] face an equivalent need to adjust their campaign strategy, they . . . suffer harm to their legally protected interests."); *see also Vote Choice, Inc. v. DiStefano*, 4 F.3d 26, 36–37 (1st Cir. 1993) (concluding that candidates could show standing by demonstrating that new campaign finance rules would have an "impact on the strategy and conduct of an office-seeker's political campaign"). But the plaintiffs in *Shays* were sitting members of Congress, and it was a "given" that they were running for re-election. 44 F. 3d at 90 (concluding that the "retention of office" is a cognizable interest). In contrast, Herron is merely *contemplating* a run for office, and he has no existing campaign to adjust. Herron

nevertheless insists that he might be forced to adjust his campaign strategy at some undefined point in the future: "the Herron campaign has faced and is continuing to face a decision whether to run for Congress and, if so, how to structure its campaign when the Commission refuses to enforce the corporate contribution prohibition and filing requirements against its opponent." Pl.'s Reply at 12. In effect, Herron asks this court to confer standing on any individual who envisions a potential run for office in the undefined future. Because this would effectively eliminate the "concrete and particularized" injury requirement, the court will reject Herron's request.

Second, Herron also alleges that he will suffer a "reputational harm," but this argument has little merit. Under certain circumstances, a plaintiff may establish Article III standing by alleging that the government marred his or her reputation. *See, e.g.*, *Meese v. Keene*, 481 U.S. 465, 472–73 (1987) (concluding that a plaintiff who wished to exhibit certain films had standing to challenge a statute requiring him to characterize those films as "political propaganda"); *Foretich v. United States*, 351 F.3d 1198, 1213 (D.C. Cir. 2003) (finding a "concrete" reputational harm where the government's action "effectively brand[ed] him a child abuser and an unfit parent"). But here, Herron has submitted no evidence to suggest that his reputation was actually harmed. Instead, Herron strings his argument together with a series of dubious propositions. Herron has not established that he will be forced to compete in an illegally structured campaign environment in the future. So he argues that he has suffered a secondary harm: namely, the difficulties associated with the uncertainty of knowing whether the FEC acted in a lawful manner. The Circuit has made clear that this type of injury does not give rise to standing. *Common Cause*, 108 F.3d at 417. To sidestep this ruling, Herron complains of a tertiary harm: namely, that the FEC's choice not to endorse his viewpoint is something of a value

judgment against him.  By failing to endorse his views, Herron alleges, the FEC has tarnished his reputation.[4]  In the plaintiff's view, any individual whose position differs with public policy could recast his difference of opinion into a nebulous claim of "reputational harm."  Endorsing this argument would be a stark departure from precedent.  *See Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 217 (1974) (concluding that the "generalized interest of all citizens in constitutional governance" does not support Article III standing); *see also Ariz. Christian Sch. Tuition Org. v. Winn*, 131 S. Ct. 1436, 1449 (2011) ("Few exercises of the judicial power are more likely to undermine public confidence in the neutrality and integrity of the Judiciary than one which casts the Court in the role of a Council of Revision, conferring on itself the power to invalidate laws at the behest of anyone who disagrees with them.").  The court concludes that the plaintiff's alleged reputational injury is even farther removed from the interest in good governance that was rejected in *Common Cause*.  Thus, Herron's claim of reputational harm is far too attenuated to give rise to standing.  *See McBryde v. Comm. to Review Circuit Council Conduct*, 264 F.3d 52, 57 (D.C. Cir. 2001).

Third, Herron claims that he suffered an "informational injury."  Pl.'s Reply at 12.  Plaintiffs may claim that they suffered an "informational injury" if a defendant has not complied with a rule mandating the disclosure of specified information.  *FEC v. Akins*, 524 U.S. 11, 21 (1998) (holding that "a plaintiff suffers an 'injury in fact' when the plaintiff fails to obtain information which must be publicly disclosed pursuant to a statute"); *see Ctr. for Individual Freedom v. Van Hollen*, 2012 WL 4075293, at *1 (D.C. Cir. Sep. 18, 2012).  While Herron initially sought information that should be publicly disclosed (accurate financial disclosures from the Fincher campaign), he ultimately received that information.  Herron now admits that any

---

[4]   As the FEC succinctly puts it, "[Herron] is arguing that because the Commission rejected its view of the law and dismissed its complaint, its candidate now looks bad."  Def.'s Reply at 2.

controversy involving Fincher's failure to disclose is moot. Pl.'s Reply at 13 ("[Steven Fincher for Congress] made the first informational injury moot by filing an amendment to its Commission report admitting that Gates Bank had provided $250,000 to the Fincher campaign."). Nevertheless, Herron alleges that if he decides to "run for federal office in 2014, [his] campaign will face the real possibility of an opponent obtaining illegal campaign contributions for his or her campaign and lying about the source of funds because the Commission has demonstrated that it will not deter such conduct by punishing it." Herron Decl. ¶ 16. But this is speculation pure and simple, and there is no evidence to support this claim. In sum, the court concludes that Herron's alleged informational injury is too "conjectural or hypothetical" to give rise to standing.[5]

## IV. CONCLUSION

The various doctrines surrounding Article III's case-or-controversy requirement provide several means by which the court can gauge the constitutional limits of its power. *See Vander Jagt v. O'Neill*, 699 F.2d 1166, 1178–79 (D.C. Cir. 1983) (Bork, J., concurring) ("All of the doctrines that cluster about Article III—not only standing but mootness, ripeness, political question, and the like—relate in part, and in different though overlapping ways, to an idea, which is more than an intuition but less than a rigorous and explicit theory, about the constitutional and prudential limits to the powers of an unelected, unrepresentative judiciary in our kind of government."). Viewed one way, Herron's claim is moot because he complains of a past

---

[5] Because jurisdiction is lacking, this court has no occasion to weigh the merits. But from a glance, it appears that this case boils down to a challenge over how vigorously the FEC pursued Herron's administrative complaint. These types of decisions are likely to fall within the bounds of the FEC's "considerable" prosecutorial discretion. *Nader v. FEC*, 823 F. Supp. 2d 53, 65 (D.D.C. 2011); *see Akins v. FEC*, 736 F. Supp. 2d 9, 21 (D.D.C. 2010) ("The FEC has broad discretionary power in determining whether to investigate a claim, and whether to pursue civil enforcement under the [FECA].").

controversy that is unlikely to recur. Viewed another way, Herron lacks standing because his injury is conjectural and hypothetical. Under either approach, Herron seeks an opinion that might prove helpful to a political campaign that he has not yet decided to launch. Thus, the court concludes that jurisdiction is lacking. Accordingly, the court will deny Herron's motion for summary judgment and grant the FEC's cross-motion for summary judgment. An order consistent with this memorandum opinion is separately issued this 8th day of November, 2012.

                                                  RUDOLPH CONTRERAS
                                                  United States District Judge